CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY v. MINNIE LANDAUER.

FILED APRIL 11, 1893. No. 4885.

1. A new trial should be allowed when it is clear that material uncontradicted evidence has been disregarded by the jury, and which, if considered and given due weight, would have required a different verdict from that returned.

2. **Negligence:** QUESTION FOR JURY. It is the settled rule in this state that where different minds may draw different inferences from the same state of facts, as to whether such facts es-

tablish negligence, it is a proper question for the jury and not for the court. But that rule is subject to the qualification that the inference of negligence must be a *reasonable* one. Where it is impossible to infer negligence from the established facts without reasoning irrationally and contrary to common sense and the experience of average men, it is not à question for the jury, and the court should direct a verdict for the defendant. MAXWELL, CH. J., dissenting.

3. **Carriers.** It is the duty of railroad companies to stop their trains at stations a sufficient length of time for passengers to get on and off, and it is negligence for the conductor or other servant of the company to start a train while passengers are obviously in the act of getting on or alighting therefrom.

4. ———: NEGLIGENCE. But when a train has made a reasonable stop and passengers have not given notice or other evidence of their intention to alight, the starting of the train is not *per se* negligence for which the company will be held liable.

5. ———: CRIMINAL NEGLIGENCE. The term criminal negligence, as used in sec. 3, art. 1, ch. 72, Comp. Stats., means gross negligence, such as amounts to reckless disregard of one's own safety and a willful indifference to the consequences liable to follow.

6. ———: PASSENGER ALIGHTING FROM MOVING TRAIN: PERSONAL INJURIES: CONTRIBUTORY NEGLIGENCE. It is not such contributory negligence for a passenger to jump from a moving train as will in every case prevent a recovery under the statute above cited; but where the circumstances are such as to render it obviously and necessarily perilous, and to show a willful disregard of the danger incurred thereby, such act amounts to criminal negligence as above defined. MAXWELL, CH. J., dissenting.

7. ———: ———: ———: ———: EVIDENCE. In an action to recover for personal injuries sustained by the plaintiff in jumping from a moving train, the undisputed evidence is that after the train stopped at C. station, for which she held a ticket, the conductor called out the name of the station, but did not leave the train, being engaged in collecting tickets; but by his order the brakeman got off at the rear of the train and walked along the station platform to the rear of the next to the last car, where, after assisting some passengers to alight, and seeing no others to get off, he gave the signal "all aboard." After the train had started, and was well under way, plaintiff, who had occupied the fourth seat from the front of the rear car, came out upon the front platform thereof, and after hurriedly stepping down one

step, and without warning to the conductor or brakeman, who both supposed the passengers for that station had all left the train, and without looking to see where she would land, jumped at a right angle from the train, and in falling was severely injured. Another passenger who had alighted on the opposite side had walked the length of a car, crossed over on the car platform and walked fifty feet to the gate of a park that distance from the station, while other passengers had walked to a point some distance inside the park fence before the train pulled out. It also appears that plaintiff was a young woman, seventeen years of age, of average intelligence, and well acquainted with the premises. *Held*, Not to sustain the negligence charged, viz., the negligent starting of the train without giving plaintiff sufficient or reasonable time to alight. *Held, further*, That plaintiff was guilty of such contributory negligence as will prevent a recovery for the injuries received in jumping from the train. MAXWELL, CH. J., dissenting.

ERROR from the district court of Lancaster county. Tried below before TIBBETS, J.

*T. M. Marquett* and *J. W. Deweese*, for plaintiff in error.

*Leese & Stewart, contra.*

POST, J.

This is a petition in error by the Chicago, Burlington & Quincy Railroad Company, and brings into this court for review a judgment recovered by the defendant in error for personal injuries alleged to have been received by her in alighting from a train of the plaintiff in error at Cushman Park near Lincoln. It appears from the petition that the plaintiff below, Minnie Landauer, (now Minnie Parr), on the 5th day of July, 1889, purchased from the defendant below a first class ticket from Lincoln to Cushman park, and that upon the arrival of the train upon which she was a passenger at the last named station " she started to alight from said train, and while so attempting to alight the defendant, negligently and carelessly and without giving plaintiff sufficient or reasonable time in which to alight,

started its said train whereby plaintiff was thrown violently
to the ground without any fault or negligence on her part,"
by reason of which she received severe personal injuries,
etc. The only allegation of negligence is that included
within the above quotation from the petition. In its an-
swer the defendant below denies all allegations of negligence
on the part of its servants and alleges that whatever injuries
were received by the plaintiff therein were in consequence
of her own negligent and careless act in jumping from the
train while in motion. Cushman park is a flag station on
the defendant's line of road three miles west of Lincoln,
where trains are accustomed to stop during the summer
months, principally for the convenience of persons from
the city visiting the park. The platform where passengers
enter and alight from the cars is 215 feet in length and 7
feet wide, its elevation being a few inches above that of the
rails of the track. The plaintiff below was at the time of
the injury a young woman seventeen years of age, evi-
dently possessed of the average intelligence and who was
acquainted with the premises, having frequently visited
the park, going and returning on the defendant's trains.
On the day in question there were an unusual number of
passengers from Lincoln. The conductor, who was pass-
ing from the front to the rear of the train collecting tickets,
had just passed the plaintiff, who was sitting three or four
seats from the front door of the last or ladies' car when
the train reached the station. He called out the name of
the station, but kept on collecting tickets, having given
orders for the brakeman to stop and start the train while he
was thus engaged. It is clearly shown, and not disputed,
that the brakeman got off at the rear end of the train and
walked along the station platform to the rear of the smok-
ing car which was the next in front of the ladies' car, where
he signaled the engineer to start the train. He then
entered the smoker from the rear, closing the door after
him, at which time the train was in motion. It is evident

that the train had started before the plaintiff attempted to alight, as she testifies on her direct examination that before she left the car she saw the brakeman through the glass door in front of her. Her testimony, so far as it relates to the cause of the injury, is as follows:

When I supposed the train had stopped I walked out to the front. I was in the last coach and I walked to the front of the coach and looked behind me and seen the conductor talking to some one, and the aisle seemed to be filled with men as I looked back behind me. I think it was about the fourth seat from the front, and when I looked behind me I seen he was standing there, so I just went right out.

Q. Which way did you go out?

A. The front of the coach.

Q. How far did you sit from the front door?

A. About three or four seats back. I can't remember which, I think it was four. I went out, and just as I was going, before I opened the door, I looked through the door, and I could see, through the glass door, the brakeman—I could tell it was the brakeman by his cap, and just as I got out I looked down and I seen the platform just as I got out of the door. I don't remember looking toward the platform any more; I remember looking down to my feet where I was to step. I stepped one step, and as I stepped the other step—the wind was blowing real hard—and I raised my foot, and as I stepped, I did not step on the platform, and it threw me to the ground. I laid there until some one came and picked me up. I don't remember seeing the platform after I took the second glance out; I seen the step when I stepped, and then I stepped right off in the air.

Q. When did you first discover that the train was moving; that is, if it was moving?

A. I did not know that the train was moving; I did not realize that the train was moving at all; I supposed it had stopped.

Q. Had it stopped prior to this time?

A. They say that it had, but I could not state that it had. I have no knowledge of the train stopping whatever. So I was picked up and the train went on, and I remember the train backing back, and I remember the conductor saying, after they had carried me to the stile, he said : "If I had known you was on the train and wanted to get off I would have been glad to have helped you off." He seemed to be very sorry that I was hurt.

Q. Did the conductor get out of the car when the train stopped; I don't mean when they backed up?

A. No, sir; he was standing right there talking to the men.

Q. Did you not see either the conductor or the brakeman on the platform?

A. No, sir; I expected one or the other to help me off; it was quite a step, but I remember him saying, "if he had known it he would have been glad to help me off." There was a physician on the train that said my ankle was broken.

\*        \*        \*        \*        \*        \*        \*

Q. About how many feet west of the platform was it that you fell?

A. I could not just exactly say, but I think it must have been between seven and eight feet, something like that.

Q. Mrs. Parr, as soon as you thought the train had stopped there at Cushman park, what did you do? Did you sit in your seat or did you get up and start to get off?

A. I started to get off when I thought the train was stopped.

Q. You have been there before?

A. Yes, sir.

Q. On that train to that station before?

A. Yes, sir.

Q. What was your age at that time?

A. I was seventeen years old.

And on cross-examination she testifies:

Q. Did the train stop at Cushman park? Can you say that it did?

A. I have no knowledge or anything.

Q. Did you not know at the time whether it was stopped or not?

A. No, I thought it was stopped, I naturally supposed it would stop.

Q. Can't you tell well enough whether a train is running or standing still?

A. The wind was blowing real hard, and from what some of the rest say it was pulling out real slow, as it always does when a train starts; I suppose it was just pulling out. I think it was stopped when I stepped because I could see the platform when I first looked out, but after that I don't remember seeing the platform. I expected, of course, to step on the platform, but I stepped right in the air.

Q. Did you see the platform when you looked out through the window?

A. When I went out on the step outside of the door.

Q. So you suppose the train was moving out slowly as they do when they start?

A. I say I thought it was stopped, but that is the way others say it was; I thought it was stopped.

Q. Did you stop when you went out on the platform or look to see what the train was doing or undertake to get off?

A. No, I just took a glance out and then just took a step. I just turned my head as I closed the door. I was looking to see if any one was there to help me off, that was my reason for looking.

Q. Did you see the brakeman in the car in front of you?

A. Yes, right in front of me; I seen him there through the doors; he was looking this way, or had his face turned sideways.

Q. Did you take hold of the railing to the car platform, or anything?

A. Yes, sir; you mean—I don't understand the question.

Q. You know on a car platform there is an iron railing on the outside and on the inside. Did you take hold of that?

A. Yes, sir; I took hold of the one on the inside.

Q. What did you have in your hands?

A. A parasol, that is all.

Q. Did you let go of that railing?

A. Yes, sir; I can't say, of course, I suppose, as I stepped—yes, I let go of the railing just as I stepped.

Q. Did you get down more than one step?

A. I stepped one step; you know there is only two steps, isn't there, that is one step and then a step to the ground?

Q. How many steps down did you go from the top?

A. I don't remember that.

Q. You took hold of the railing with the left hand and got off on the left-hand side of the train; that is you took hold of the railing next to the car?

A. Yes, sir; there was a kind of brass piece there.

Q. The train was headed west and you got off on the left-hand side of the train toward Cushman park?

A. Yes, the side that faces the gate; I don't remember about the direction. I am always turned around about directions.

Q. What I mean to say is—of course, we know when a train is going out of Lincoln that way is going west?

A. Yes, sir.

Q. And you got off on the left-hand side?

A. Yes, sir.

Q. When you first got out there to the station did you say you went back to the rear end of the coach?

A. No, I raised up and looked back to the rear end of the coach, as I showed you a while ago. I first looked out, then I looked up and seen the conductor standing there.

Q. He was back at the rear end taking up tickets?

A. He was right in the center or near the center of the

coach talking to some men, and I think the aisle was full and crowded with men. I think some of them were sitting with their feet in the aisle, sitting on the arms of the seats with their feet in the aisle. He was standing there.

Q. Is it not a fact now that you went back to get off that way; you went back to where the conductor was and saw that the aisle was crowded and then turned and went to the front?

A. No, sir.

Q. Did you not so tell the conductor after you was hurt?

A. No, sir.

Q. And the other people that were there?

A. No, sir.

Q. Did you not say that when you came out after it was over?

A. No, sir.

Q. What did you mean by saying you had no knowledge of the stopping of the car?

A. I said I supposed the train was stopped when I stepped off, and that I did not know it was moving; if it was moving I did not know it.

Q. You did not wait long enough to see whether it was going or standing still?

A. No, sir; I supposed it had stopped because I had only got to the outside, and I thought it would stop long enough to let me off, but I don't know that I thought anything about it, only I think now that I supposed at the time that it was stopped, and I stepped off in the air.

The only other witness who testified for the plaintiff with respect to the injury was Wm. Kendall, who was, according to his testimony, 600 or 700 feet south of the train at the time of the accident. On his direct examination he says:

Q. Was you looking at the train when it came in?

A. I was looking at the train just before it stopped, you might say.

Q. Did you see it stop? Did you see it when it was standing?

A. Yes, I did.

Q. Can you say about how long it stopped?

A. I don't think the train stopped to exceed forty seconds.

Q. You mean then just coming to a stop and starting right out?

A. Yes.

Q. Did you see anything of Mrs. Parr, then Minnie Landauer? Whereabouts was she when you saw her?

A. I did not see her until she was in the air, you might say.

Q. Describe how she appeared; whether she appeared to be jumping, or falling or how?

A. She appeared to be falling then.

Q. How far west of the platform did she fall, if you remember?

A. That I do not remember; it has been quite a while ago, and I have not been out there only two or three times since, and I never looked to see.

On his cross-examination he testified:

Q. You were looking at the train?

A. I was looking at it before it came in; that is, when it got within maybe fifty or sixty yards of the station.

Q. What made you take notice of the time it stood there?

A. Sir?

Q. Did it stop at all?

A. I did not take notice, you might say, but that is my idea; that it did not stop over forty seconds.

Q. The first you saw of her she was in the air?

A. When I seen her she was in the air.

Q. You did not see her at the time she leaped, or at the time she left the train?

A. When I seen her she was in the air. You know

yourself that all that distance away I could not tell—a lady having a dress on—whether her foot was on the step or not. I could not tell, nor you neither.

Q. You saw her in the air?

A. Yes, sir.

Q. She was out away from the car?

A. How far away I could not tell at that distance. She was in the air.

Q. And the train was doing what?

A. Now I could not say whether it was moving or standing still, or what you would call it.

Q. Still you say the train was not running at the time she got off.

A. I don't know what you would call it, whether you would call it stopped or running.

On the part of the defendant below, Lyman, the conductor, testified that being engaged at the time in collecting tickets and fares, he ordered the brakeman to start and stop the train at Cushman park; that he, witness, called out the station after the train stopped; that he also noticed just as the train started again some of the passengers who had left the cars over in the park some distance away; that very soon thereafter, having finished collecting tickets, he started forward and was met by the brakeman, who informed him that a woman had jumped from the train. Referring to the length of the stop he testifies:

Q. About how long did you stop at that station?

A. Not less than three minutes. It might have been more, but not less than that.

Q. Was the stop longer than usual?

A. Yes, sir; it was longer than usual.

Q. Why?

A. On account of the train being crowded and I not being able to get out and see the passengers get off myself, but I had my brakeman do it and he did not know when they were all off exactly, and he thought he had given

them ample time, and didn't see any more coming and he started the train.

Beck, the brakeman, testifies that he got off at the rear of the train and walked leisurely along the station platform to the rear end of the smoker and helped two men to alight who appeared to need assistance. As to what transpired immediately thereafter he testified as follows:

Immediately before I got on I gave the signal "all right, go ahead." I walked into the smoker—at that time the rear car door was closed and I saw nobody trying to get out, so I walked right into the smoker and I judge I had got three or four steps, probably ten or twelve feet, in the car, when somebody asked me a question and I turned sideways this way, to answer the question; as I did so I saw a black object—the lady had on a black dress—something came to me that something was wrong, and I made a rush to the door, and as I did, I just about got to the door as she went in the air. She jumped; I did not see her take a step down at all; she may have taken a step, but apparently she left the top of the platform and jumped right out in the air sideways. I looked out, I hung right out to see if she was hurt, and she fell and lay there. I made a rush right into the car and notified the conductor that there was a lady jumped from the train. He pulled the cord and stopped, and we backed up.

Q. Did you see her when she lit on the ground?

A. Yes, sir.

Q. How did she alight?

A. The train was headed in this way, and of course she jumped from the platform in this way. (Indicating at right angle to the direction of the train.) She struck right on her two feet and rolled right over about once and laid there.

Q. She fell right over?

A. Yes, sir.

Q. Did she take hold of anything?

A. Not that I know of—I don't believe she did.

Q. First was the black object and a rush to the door, and then you saw her jump from the platform?

A. Yes, sir.

Q. About how fast was the train going at that time?

A. I should judge we had gone about two car lengths, and the train would get under pretty good headway in that distance; it would be pretty hard for me to state the rate of speed we were running.

Q. Have you been railroading a good while?

A. It has been the heft of my life for eighteen years.

Q. What would you say as to the danger of a person jumping off in that way with that rate of speed?

A. I don't think it would be safe for me to jump off that way.

Foster Seacrest, a passenger, testified that he alighted on the north or right-hand side of the train and walked the length of the smoking car when he crossed to the south side of the train upon the forward platform of the smoker or the rear platform of the baggage car. He then walked over to the park steps where he stood engaged in conversation for two minutes or more before the train pulled out. He did not see the plaintiff jump and could not tell how far the train had gone when he saw her on the ground. He also testified that other passengers from the train were quite a distance inside of the park when the train started.

Mrs. Smith, who was occupying the last seat at the rear of the car, noticed the plaintiff, after the train stopped, leave her seat and go to the rear of the car where some men were standing, when she turned and walked forward and that the train started just as she got to the door.

J. C. F. McKesson, a passenger, was standing at the rear end of the car and testified as follows:

Q. What did you see Miss Landauer do?

A. I saw her coming through the train towards me, that is, towards the rear end of the car. She seemed to be some-

what bewildered and then turned around and went back the other way to the west door.

Q. How long did the train stop there?

A. I don't know.   The usual length of time, I presume a minute or a minute and a half.

Q. What was the train doing with reference to being still or moving at the time she left the rear end of the coach to go to the front?

A. The train was in motion.

Q. What was its speed by the time she got out on the front platform?

A. I could hardly say—you mean per hour?   It had started up from the station.   I don't know just what rate it ran.

Q. How was it going with reference to a person safely jumping off or stepping off?

A. I should think it was running almost too fast for a woman to get off.

Q. Was there anybody in the front aisle to interfere with her going through that way in the first place?

A. I think not; although there might have been a person or two standing there.   The car was crowded.

Q. Do you know about how long she stopped at the rear end of the coach before she turned around to go back, and what she did while she was there?

A. I could not say just how long.   She came to the rear end of the coach evidently intending to go out there, I supposed at the time, and there were probably five or six parties standing up in the rear end of the coach, and I judged she changed her mind and thought she could not get through there, and went back to the other end.   She came from the west end of the coach.

On cross-examination he testified:

Q. Did you take any special account of the time the train stopped there?

A. No, sir; I made no note of the time any more than I know that it stopped.

C. W. Hoxie, who was standing near the rear door of the smoking car and directly facing the front door of the ladies' car when the train pulled out, testified that after it had started a lady came rushing out of the ladies' car and, in the language of the witness, "she got on the platform and rushed right off." He further testifies:

Q. About how fast was the train going when she jumped off?

A. It was moving pretty fast—as fast as a train usually is when it pulls out of a place. I judge it was about 150 feet from the platform, it was very close to the creek I know.

Q. Explain what she did when she got out of the car.

A. I could not say, she came out of the car and seemed to be a little excited and just simply went right off of the train. She may have stepped down a step, but I just saw her a minute and she was going and went right off.

Q. Did she take hold of the hand rails?

A. No, sir; I did not notice that; it was done in a second really; she came out of the door there.

Q. I will ask you about how long the train stopped at the station?

A. It was about the usual time, a minute and a half or two minutes; it was not very long, about the usual time they stop at local stations; I did not pay attention to it; it was about the usual time trains stop, and the conductor got off; I presume it was the conductor, I heard him call "all aboard," and the train started.

Wm. Bougart, a passenger, testifies that the train stopped about two minutes; that after getting off he walked over to the park fence, where he saw the plaintiff fall from the front platform of the rear car.

The foregoing is believed to be a fair summary of the evidence; and such parts thereof as we are referred to by the defendant in error to support the judgment are set out at length. It has been repeatedly held that a verdict will not

be disturbed by this court where the evidence is conflicting, although the weight thereof may appear to be with the unsuccessful party.   But that rule does not apply when it is clear that material undisputed evidence has been disregarded by the jury, and which, if considered and given due weight, would require a different verdict.  (*Dunbier v. Day,* 12 Neb., 596.)  If our conclusion is to depend upon the mere opinions of the several witnesses as to the length of the stop at Cushman park, this case might be held to be within the rule above stated.  But it is impossible to reconcile the testimony of the plaintiff's witnesses with the facts disclosed by the uncontradicted evidence of the disinterested witnesses for the defendant below.  The claim that she could not have reached the station platform in safety from her position, four seats distant from the door of the car, within the time required for one passenger to alight on the opposite side, walk the length of the car, and, after crossing between the cars, reach the park gate fifty feet distant, and for others to walk from the train to a point inside the park fence, is not only improbable but unreasonable and insufficient to warrant a finding in her favor upon that issue. It is by law made the duty of railroad companies to stop their trains at stations a sufficient time for passengers to get on and off the cars in safety.   And it is universally held to be negligence for the conductor or other servant to start a train while passengers are obviously in the act of getting on or alighting therefrom.   But if the train has stopped a reasonable time and passengers have not given notice or other evidence of their intentions to alight, the starting of the train is not *per se* negligence for which the company will be held liable.  (*Chicago, St. L. & N. O. R. Co. v. Scurr,* 59 Miss., 456; *Trigg v. St. Louis, K. C. & N. R. Co.,* 74 Mo., 147; *International & G. N. R. Co. v. Terry,* 62 Tex., 380; *Raben v. Central Ia. R. Co.,* 73 Ia., 579; *Clotworthy v. Hannibal & St. J. R. Co.,* 80 Mo., 220.)

It is argued that the duty of the conductor is to person-

45

ally assist passengers entering and leaving the cars. We have not, however, been referred to any authority for such contention. It is the duty of a railway company to give warning before starting trains, and to render passengers reasonable or necessary assistance in entering and leaving the cars; but we are aware of no rule which imposes such duty upon the conductor to the exclusion of other servants of the company. The only negligence charged in the petition is the starting of the train without giving the plaintiff therein sufficient or reasonable time in which to alight. But as appears from the record, it is impossible to reconcile that claim with the undisputed facts in the case. There was therefore a failure of proof to sustain the allegation of negligence and the motion for a new trial should have been sustained upon that ground. We have not overlooked the rule stated in *City of Lincoln v. Gillilan*, 18 Neb., 114, viz., that where the facts, although undisputed, are of such character that different minds may draw different inferences therefrom, as to whether such facts establish negligence, it is a proper question for the jury and not for the court. That is an old and sound rule, but is subject to the qualification that the inference of negligence must be a *reasonable* one. And the question of its reasonableness, that is to say, whether the particular act of negligence charged can be found from the established facts of the case, without reasoning irrationally and without rejecting common sense as well as the rules of cause and effect, is one exclusively for the court. No clearer or more accurate statement of the rule can be found in the books than that of Judge Thompson in his work on Trials, viz., "That the judge is authorized to nonsuit the plaintiff or direct a verdict for the defendant, according to the mode of practice in the particular jurisdiction, in either of the following cases:

" 1st. Where all the facts which the plaintiff's evidence fairly tends to prove, if admitted to be true, would not authorize a conclusion that the defendant has been guilty of negligence as matter of law.

"2d. Where, either upon the plaintiff's evidence, assuming it to be true, or upon the state of facts shown by the evidence in the whole case, which stand undisputed and which ought not therefore to be left to the decision of the jury, an inference unavoidably arises that the person injured was guilty of negligence materially and directly contributing to produce the accident complained of." (Thompson, Trials, 1667.)

But aside from the question of negligence on the part of the defendant company, it is clear from her own testimony that the plaintiff was guilty of such contributory negligence as will defeat her right to recover. It was held in effect in *Omaha & R. V. R. Co. v. Chollette*, 33 Neb., 143, that it is not in every case negligence *per se* for a passenger to jump from a moving train; but where the attending circumstances are such as to render the act obviously and necessarily perilous, the well established rule is that it is such contributory negligence as will bar a recovery. Cases almost without number might be cited in support of the rule just stated, but it is sufficient for our purpose to refer to the following text-books: Ray, Neg. of Imposed Duties, p. 390; Beach, Contributory Neg., secs. 146, 147; Deering, Neg., sec. 95; Wharton, Neg., sec. 369 *et seq.*; 1 Thompson, Neg., 459; 2 Am. and Eng. Ency. of Law, 765.

It is said by Mr. Beach, in section 146, cited above: "In a majority of instances, however, where the character of such an act has been an issue, it has been held contributory negligence. * * * The weight of authority is to the effect that while an attempt to board a moving train of cars is not *per se* negligence, it is nevertheless presumptively negligent, and in a majority of cases actually negligent to the extent of preventing a recovery." We have no occasion to discuss further the general rule, since it is evident that the effect of our statute has been to enlarge the liability of railroad companies for injuries to passengers.

It is provided by sec. 3, art. 1, of ch. 72, Comp. Stats., that "Every railroad company shall be liable for all damages inflicted upon the person of passengers while being transported over its road, except in cases where the injury done arises from the *criminal negligence* of the persons injured." The question to what extent, if at all, the common law liability of a railroad company for *its own* negligence has been enlarged by the statute quoted is not involved in this controversy. The term criminal negligence was held in *Omaha & R. V. R. Co. v. Chollette, supra,* to mean gross negligence, such as would amount to a flagrant and reckless disregard of one's own safety and a willful indifference to the injury liable to follow. Viewing the act of the plaintiff in its most favorable light, she was guilty of criminal negligence within the foregoing definition. She appears to have acted recklessly and without regard to the consequences, and to have jumped from the moving train without thought of where or how she would land.

Exception was taken to several of the instructions by the plaintiff in error, but as the judgment must be reversed for reasons stated they will not be considered. The judgment of the district court is reversed and the cause remanded for further proceedings therein.

REVERSED AND REMANDED.

NORVAL, J., concurs.

MAXWELL, CH. J., dissenting.

This action was brought by the defendant in error against the plaintiff in error to recover for personal injuries sustained by her in alighting from the plaintiff in error's train. On the trial of the cause the jury returned a verdict in her favor for the sum of $5,000, upon which judgment was rendered. The first objection is that the proof does not sustain the charge in the petition. The petition is as follows:

"Plaintiff for cause of action says that Charles E. Casey is her duly appointed, qualified, and acting guardian under appointment of the county court of Pawnee county, Nebraska.

"2. That the defendant is a corporation duly organized under the laws of Nebraska, and is a common carrier of persons and property for hire; that it owns and operates a railroad from the city of Lincoln through Cushman park, a station on the line of said railroad.

"3. That on the 5th day of July, 1889, the plaintiff purchased of defendant a ticket entitling her to a passage on its cars from Lincoln, Nebraska, to Cushman park; that plaintiff thereupon entered and became a passenger on the cars of defendant on said railroad and rode therein to said Cushman park station; that upon arriving at said station she started to alight from said train, and while so attempting to alight the defendant negligently and carelessly, and without giving plaintiff sufficient or reasonable time in which to alight, started its said train, whereby plaintiff was thrown violently to the ground without any fault or negligence on her part; that by reason of her being thrown to the ground as aforesaid, plaintiff was permanently injured, in that her leg was broken, her body bruised, and her spine injured; that by reason of her said injuries plaintiff was sick for several months, and necessarily expended for physicians' services the sum of $300, and her health has been greatly and permanently impaired, in all to her damage in the sum of $15,000. Wherefore the plaintiff prays judgment against the defendant for the sum of $15,-000 and costs of suit."

There is a great conflict in the testimony, but the following facts appear to be sustained by the weight of the evidence. The defendant in error at the time of the accident was about seventeen years of age. She was a passenger on the train for Cushman park, about three miles from Lincoln. She was in the last car in the train and was sitting

in about the fourth seat from the front end of the car. The train was crowded with passengers, there being a number standing in the aisle in the last car back of the defendant in error. The conductor had not completed gathering the tickets when Cushman park was reached and· did not go out of the car, but trusted to the brakeman to stop and start the train. The defendant seems to have risen from her seat when the train stopped and looked back towards the rear end of the car as though she would have gone out that way, but seeing the passage way blocked with passengers she went out of the front end of the car, alighting after it had passed the platform, and was very severely injured. If the plaintiff in error is liable the judgment is not excessive. But it is said that the testimony does not support the allegations of the petition. The defendant in her testimony says:

I got on the train. I bought my ticket at the B. & M. depot and got on the train. I had not rode very far until the conductor came and took up the ticket. He said something when he took up the ticket; he seemed to be vexed. I can't state just what he said, but he said he did not see why people bothered the company in riding such short distances; he did not see why there were not teams to take people such short distances in the country; he did not see why people should bother the B. & M. to stop at such places as Cushman park, because there was no station there. That was all he said, and I did not think anything about it, as I have heard other ladies say he had made the same remarks to them. I rode until I got to Cushman park, and as I got to Cushman's house, a white house this side of Cushman park—

Q. How far?

A. I should think it was a half of a quarter or a quarter of a mile. I raised up just about like that (witness raising up in chair and leaning forward) to look out towards the park to see—I expected to see Mr. Beerup's little children.

They had told me that day that my brother had been sun-struck and was real sick, and that was the reason I wanted to see him, and why I looked out, but I did not see them. So I supposed I could get off all right, so when the—when I supposed the train had stopped I walked out to the front. I was in the last coach, and I walked to the front of the coach and looked behind me and seen the conductor talking to some one, and the aisle seemed to be filled with men as I looked back behind me. I think it was about the fourth seat from the front, and when I looked behind me I seen he was standing there, so I just went right out.

Q. Which way did you go out?

A. The front of the coach.

Q. How far did you sit from the front door?

A. About three or four seats back. I can't remember which, I think it was four. I went out, and just as I was going, before I opened the door, I looked through the door and I could see, through the glass door, the brakeman—I could tell it was the brakeman by his cap, and just as I got out I looked down and I seen the platform just as I got out of the door. I don't remember looking toward the platform any more; I remember looking down at my feet where I was to step. I stepped one step, and as I stepped the other step—the wind was blowing real hard—and I raised my foot, and as I stepped, I did not step on the platform and it threw me to the ground. I laid there until some one came and picked me up. I don't remember seeing the platform after I took the second glance out; I seen the step when I stepped and then I stepped right off in the air.

Q. When did you first discover that the train was moving—that is, if it was moving?

A. I did not know that the train was moving; I did not realize that the train was moving at all; I supposed it had stopped.

Q. Had it stopped prior to this time?

A. They said it had, but I could not state that it had ;. I have no knowledge of the train stopping whatever. So I was picked up and the train went on, and I remember the train backing back, and I remember the conductor saying after they had carried me to the stile, he said, "If I had known you was on the train and wanted to get off I would have been glad to have helped you off." He seemed to be very sorry that I was hurt.

Q. Did the conductor get out of the car when the train stopped? I don't mean when they backed up.

A. No, sir; he was standing right there talking to the men.

Q. Did you not see either the conductor or the brakeman on the platform?

A. No, sir; I expected one or the other to help me off, it was quite a step, but I remember him saying if he had known it, he would have been glad to help me off. There was a physician on the train that said my ankle was broken.

On cross-examination she testifies:

Q. What did you have in your hands?

A. A parasol, that is all.

Q. Did you let go of that railing?

A. Yes, sir; I can't say; of course, I suppose as I stepped—yes, I let go of the railing just as I stepped.

Q. Did you get down more than one step?

A. I stepped one step; you know there is only two steps, isn't there, that is one step and then a step to the ground.

Q. How many steps down did you go from the top?

A. I can't remember that.

Q. You took hold of the railing with the left hand and got off on the left-hand side of the train; that is, you took hold of the railing next to the car.

A. Yes, sir; there was a kind of a brass piece there.

Q. The train was headed west and you got off on the left-hand side of the train towards Cushman park?

A. Yes, the side that faces the gate; I don't remember

about the direction, I am always turned around about directions.

Q. What I mean to say is—of course, we know when a train is going out of Lincoln that way is going west?

A. Yes, sir.

Q. And you got off on the left-hand side?

A. Yes, sir.

Q. When you first got out there to the station, did you say you went back to the rear end of the coach?

A. No; I raised up and looked back to the rear end of the coach, as I showed you a while ago; I first looked out, then I looked up and seen the conductor standing there.

Q. He was back at the rear end taking up tickets?

A. He was right in the center or near the center of the coach talking to some men, and I think the aisle was full and crowded with men; I think some of them were sitting with their feet in the aisle, sitting on the arms of the seats with their feet in the aisle. He was standing there.

Q. Is it not a fact now that you went back to get off that way; you went back to where the conductor was and saw that the aisle was crowded, and then turned and went to the front?

A. No, sir.

Q. Did you not so tell the conductor after you was hurt?

A. No, sir.

Q. And the other people that were there?

A. No, sir.

Q. What did you mean by saying that you had no knowledge of the stopping of the car?

A. I said I supposed the train was stopped when I stepped off and that I did not know it was moving; if it was moving I did not know it.

Q. You did not wait long enough to see whether it was going or standing still?

A. No, sir; I supposed it had stopped, because I had

only got to the outside and I thought it would stop long enough to let me off, but I don't know that I thought anything about it, only I think now that I supposed at the time that it was stopped and I stepped off in the air.

A disinterested witness who was near at hand testifies that the train did not stop to exceed forty seconds; it appears from other testimony that the train had three other passengers who evidently were near the door or on the platform, and alighted from the train, and it apparently started again before the defendant in error had an opportunity to get off. The testimony shows that the platform at Cushman park was 215 feet in length and about seven feet in width; that it was quite low down, not higher than the rails, if so high; that the wind was blowing quite strongly—almost a gale—so that it was difficult, apparently, for a woman to control her clothing.

The testimony of the plaintiff below appears to be truthful, and, fairly construed, amounts to this: that the train stopped at Cushman park; that she had been informed that her brother had been afflicted by sunstroke; that she was very anxious to stop at the park and that as soon as the train stopped arose up from her seat, looked back and went out of the front end of the coach to leave the car; that she expected the train to stop for a sufficient length of time to enable the passengers to leave the train without undue haste, and as she started down the step of the car she saw the platform but was carried by before she alighted, although she was not aware of the fact until she fell.

It is the duty of the conductor of a railroad train to look after the passengers that wish to get on or off at the various stations along his line. (Thompson, Carriers of Passengers, 369.) He represents the company; is its authorized agent in all matters connected with the receiving and discharging of passengers as well as the subordinate servants of the corporation. The company recognizes this obligation, and the conductor, in his testimony, after

stating that the stop was longer than usual, about three minutes in all, says:

A. Yes, sir, it was longer than usual.

Q. Why?

A. On account of the train being crowded and I not being able to get out and see the passengers get off myself, but I had my brakeman do it, and he did not know when they were all off exactly, and he thought he had given them ample time and did not see any more coming and he started the train.

Q. About how many passengers got off there, do you know?

A. I think there were five.

Q. Besides this girl?

A. Four, I think, besides the girl.

The brakeman did not know, he says, when the passengers were all off exactly, and started the train. This is evidence of negligence. (*Bucher v. New York C. & H. R. Co.*, 98 N. Y., 128; *Wood v. Lake Shore & M. S. R. Co.*, 49 Mich., 370; *Brooks v. Boston & M. R. Co.*, 135 Mass., 21; *Detroit & M. R. Co. v. Curtis*, 23 Wis., 152, 27 Id., 158; *Southern R. Co. v. Kendrick*, 40 Miss., 374; *Imhoff v. Chicago & M. R. Co.*, 20 Wis., 362; *New Orleans, J., & G. N. R. Co. v. Statham*, 42 Miss., 607; *Milliman v. New York C. & H. R. R. Co.*, 66 N. Y., 642; *Pennsylvania R. Co. v. Kilgore*, 32 Pa. St., 292; *Jeffersonville, M. & I. R. Co. v. Parmalee*, 51 Ind., 42; *Keller v. Sioux City & St. P. R. Co.*, 27 Minn., 178; *Swigert v. Hannibal & St. J. R. Co.*, 75 Mo., 475; s. c., 9 Am. & Eng. R. Cas., 322; *Wabash, St. L. & P. R. Co. v. Rector*, 104 Ill., 296; s. c., 9 Am. & Eng. R. Cas., 264; *Pennsylvania Co. v. Hoagland*, 78 Ind., 203; s. c., 3 Am. & Eng. R. Cas. 436; *Toledo, W. & W. R. Co. v. Baddeley*, 54 Ill., 19; *Fuller v. Naugatuck R. Co.*, 21 Conn., 557; *Davis v. Chicago & N. W. R. Co.*, 18 Wis., 185; *Paulitsch v. New York C. & H. R. R. Co.*, 26 Am. & Eng. R. Cas., 162; 2 Am. & Eng. Ency. of Law, 762.)

Had the conductor in this case done his duty there is reasonable ground to believe no accident would have happened. It may be said that the conductor delegated his authority to the brakeman, and that for that purpose he took the place of the conductor. It is sufficient to say that the proof fails to show that the plaintiff saw the brakeman, except at a distance. She did see the conductor on the same car with herself. He found fault with the inconvenience of stopping the train at that place. He had taken up her ticket but a short time before the train stopped, and it was his duty to see that she was permitted to leave the train safely. The train evidently stopped but a short time, not long enough for the passengers to alight safely, the testimony to the contrary notwithstanding. Where a conductor or person in charge of the train gives a signal to start while a passenger is obviously in the act of getting off the train the company will be liable if injury occurs. (2 Am. & Eng. Ency. of Law, 763; *Swigert v. Hannibal & St. J. R. Co.,* 75 Mo., 475; s. c., 9 Am. & Eng. R. Cas., 322; *Bucher v. New York C. & H. R. R. Co.,* 98 N. Y., 128; *Keating v. New York C. & H. R. R. Co.,* 49 Id., 673; *Mitchell v. Western & A. R. Co.,* 30 Ga., 22; *Chicago W. D. R. Co. v. Mills,* 105 Ill., 63; s. c., 11 Am. & Eng. R. Cas., 128; *Conner v. Citizens S. R. Co.,* 26 Am. & Eng. R. Cas. [Ind.], 210; *Eppendorf v. Brooklyn C. & N. R. Co.,* 69 N. Y., 195; *Nance v. Railroad Co.,* 26 Am. & Eng. R. Cas. [N. Car.], 223; *Straus v. Kansas City, St. J. & C. B. R. Co.,* 86 Mo., 421; s. c., 27 Am. & Eng. R. Cas., 170; 2 Am. & Eng. Ency. of Law, 762.) He testifies in regard to the plaintiff:

Q. Did you look out to see whether the lady got off?

A. The lady was a regular customer of ours and I supposed she knew enough to get off before the train started.

Q. How many times did she ever ride with you?

A. A dozen times I guess; not less than a dozen and probably more.

Q. And you thought she could take care of herself?

A. Yes, sir, I thought so.

Here is self-confessed negligence on his part.  Here was a young girl, in experience but little more than a child, so far as appears, unaccustomed to travel, who had paid her fare to and desired to stop at the park, yet the man who had just taken up her ticket, and whose duty it was to see her safely on the platform, confesses that although in the same car with her and but a short distance away, he did not even look around to see if she had left the car.  In the majority opinion great stress is laid upon the testimony of two or three witnesses called by the plaintiff in error as to the length of time the train stopped.  The conductor had seven or eight tickets to take up and did not seem to have completed taking up the same when the train started, yet he testifies the train stopped three minutes, and some of the other witnesses for the plaintiff in error testify to substantially the same facts.  That this testimony is not true is shown by all the circumstances of the case.  The greatest distance any passenger is shown to have gone from the train when it started could have been traveled in much less than a minute—probably in one-half of that time.  We must remember that these witnesses did not have any particular cause to note the length of time the train stopped—some or all of them evidently in conversation and probably scarcely conscious of the stoppage of the train; yet upon this kind of testimony it is proposed to establish a preponderance of the evidence against the verdict.  The number of witnesses, where they have equal means of knowledge and are supported by all the circumstances of a case, no doubt should have great weight in arriving at a verdict, but ordinarily testimony is not given weight by the number of witnesses who testify to a particular fact, but by the means of knowledge of the witness, his apparent fairness and freedom from bias, and the support of circumstances.  Thus a passenger who desires to stop at a station

and rises from his seat to leave the train as soon as it stops
will know much more about what he did than passengers
who have no interest in the matter and take no notice of
so common an occurrence as a passenger alighting from a
train. The evidence of the first witness is positive and
direct, while that of other passengers is negative and unre-
liable. Now in the case at bar the plaintiff below testifies,
in substance, that she rose from her seat and went out of
the front door of the car, which could not have taken her
more than half a minute, and in this she is corroborated
by the circumstances heretofore spoken of. But there is
another phase of this case which shows negligence on the
part of the conductor and employes. In all parts of this
country the rule is when a train approaches a station that
a brakeman or some employe of the company appears at
the door of the car, where passengers are expected to go
out, and announces the name of the station. In most cases
he opens the door as the train stops for such passengers as
desire to leave to do so. In this case not only was this not
done, but the conductor from the back part of the car called
out the name of the station. This no doubt had a ten-
dency to confuse the plaintiff below, if she was confused.
The station being called from the hind end of the car, and
no one appearing at the front end, she would be excusable if
she supposed she was expected to get out there. Suppose
either the conductor or brakeman had appeared at the front
end of the car when the train stopped, and opened the door
and called out the station, it is very evident to my mind
that this accident would not have happened. That the
plaintiff below was expected to go out at the front door of
the car is shown from the fact that the brakeman walked
along the platform from the hind end of the car to the
front end, and apparently then signaled the engineer to
start. The testimony, as I understand it, shows gross and
inexcusable negligence on the part of the employes in con-
trol of the train. A great deal more testimony to the same

effect could be stated, but I do not care to discuss the subject further. It is very clear that the testimony fully sustains the cause of action.

2. It seems to be admitted that the instructions are predicated on the proof, and therefore they need not be set out at length.

3. In regard to the injury, a number of affidavits were filed by the plaintiff in error in support of a motion for a new trial, in which it is stated, in substance, that the verdict is excessive by reason of the injuries not being severe. These affidavits are exceedingly vague and indefinite and charge generalities and not specific facts. Dr. Crim, who has attended the defendant in error, testified on the trial as follows:

Q. I will ask you to describe what the injuries were.

A. The left ankle bore evidence of having been sprained; that is it was tender on the sides and was discolored about the ankle and for a distance of about five inches up the outer side of the leg. The point of greatest tenderness, however, was two and one-half inches above the ankle bone on the outer bone of the leg; at that point, on pressure, there was exquisite tenderness to the bone, going to show that the bone was cracked or partially fractured about two and one-half inches above the external malleolus, or the smaller of the two bones of the ankle. If she attempted to bear weight on the foot the foot turned in so that the ankle was not firm at all. The other injuries that she complained of at that time was some pain near the spinal column in the lower part of the back and she was also quite sick to her stomach; the injury of the spine at that time I did not give any special examination as I was called to see the ankle and to dress it. I put a water-glass dressing on the leg, which remained for two or three weeks and was then taken off. I think that covers the ground of the first examination.

Q. I was going to ask you how you knew that the bone was broken?

A. In examining the bone the first thing that drew my attention to it was the pain in one spot. The discoloration also pointed to a severe injury having taken place there at a previous date. Then I placed my thumbs on the bone and grasped the limb firmly and pressed with the thumbs and the bones would give together, and took the other limb and it did not give to any such extent, showing that the bone was not as strong as the one on the opposite side. If the bone had not been fractured it could not give.

Q. What kind of a fracture was it?

A. A green-stick fracture.

Q. Why do you call it a green-stick fracture?

A. Because the bone was not fractured clear across so as to cause displacement. It is the kind of a fracture that you have if you bend a twig and the fibres break on one side and hold on the other.

Q. Did you make any other examination afterward as to the spine?

A. I was called a month or so later to see her on account of her spine.

Q. Tell the jury what observations you made and what examinations you made in regard to that injury.

A. The patient was complaining of a great deal of pain in the lower two-thirds of the spine and with difficulty in walking; the pain was so severe that it bothered her about locomotion. At that time I was called to give an opinion as to whether a cautery would give her relief.

Q. Explain what a cautery is?

A. The cautery used is a piece of platinum heated to white heat by means of benzine blown through it so that this white heat would strike the back probably forty times lightly so as not to destroy the skin deep but to destroy the outer part of the skin and produce irritation. The pressure on the spinal processes, that is, the tips of the backbone, showed marked tenderness; I was informed by her attending physician that this operation was followed by

a great deal of relief, but I did not see her again for two months, or not to examine her carefully anyway.

Q. Go on and state what examination you made subsequent to that time.

A. The next time I was called was about the middle of October, or some three months after the time when I first saw her. At that time she was confined to the bed, and on being assisted out of the bed she could not walk without catching hold of something, she was then replaced in bed and the bed clothes thrown back over the lower extremities in such a way as to prevent her eye from seeing what manipulations I might make. I then took some steel pointers which we use for discovering whether a person has the natural sense of feeling pain, and found that she could not tell whether I had one or two points on any part of the leg below the knees, and I also forced the points of the pointer completely through the skin without any flinching or any sense of pain or reflex action on her part. I continued this examination, going above the knee, and when about half way between the knee and the hip, or one side of the thigh she began to show some signs of sensation ; a like sensation extended just above the middle of the hip, but beyond that point the sensation increased rapidly so that by the time I reached the region of the waist the sensation was about normal. The tenderness of the spine extended up to about the neck ; the entire region of the entire spinal column was tender, especially on pressure of the finger. I again applied the cautery from the neck clear down the whole length of the column. I saw her again in about a week and repeated the operation, and again about ten days later. At each subsequent cauterization I found the patient improved, so that at the third one she was able to walk fairly well and the sensation was nearly normal in the lower extremities; from that time I have seen her at periods varying from two weeks to three or four months up to the present time. I have repeated the cauterization at various

46

times. Sometimes the relief would extend over three or four months and sometimes not so long as that. The sensation of the limbs has been about normal since the third or fourth cauterization, but the tenderness of the spine has never completely disappeared.

Q. I would like to ask you if when a person receives a concussion of the spine it is always manifested immediately?

A. Symptoms may be manifest immediately in a severe concussion; on the other hand it may be several weeks before any symptoms appear.

Q. Why is that?

A. The hurt may be inflamed, and the injury which gave rise to the inflammation may not be severe enough to cause the patient much inconvenience at the time, but the coagulation of the blood may continue to work injury to the case from that time on.

Q. When was the last time you examined the plaintiff?

A. I should say about four to six weeks ago.

The affidavits do not dispute this testimony, and in addition to being cumulative are wholly insufficient. In the majority opinion the rules as to negligence and gross negligence as heretofore established by this court are approved, while the decision itself, in my view, practically overrules both. In a case like that under consideration the testimony should be submitted to the jury. If a court assumes to take testimony of this kind, where the principal question is the credibility of the witnesses, away from the jury and pass upon its sufficiency, the provision of our constitution that "All courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law and justice administered without denial or delay," is a glittering generality—meaningless verbiage of no force or effect. But I think we have not yet reached that point. I believe this is a meritorious case where the plaintiff below, with-

out her fault, sustained severe and lasting injuries, and that she is entitled to compensation for the same. Many other reasons could be given why this judgment should not be reversed, but because of the great length of this opinion they will be omitted. I fear the general rule established will be productive of great injustice, not only in this case but generally. In my view the judgment is fully supported by the evidence and should be affirmed.