ST. JOSEPH & GRAND ISLAND RAILROAD COMPANY v. EVA HEDGE.

FILED APRIL 4, 1895. No. 6310.

1. **Torts:** SUBSEQUENT ACT. Where in an action sounding in tort it is shown that subsequent to the alleged wrongful or negligent act a new and independent cause has intervened sufficient of it-

self to stand for the cause of the injury, the former will be held too remote to be made the basis of a recovery.

2. ———: ———: To have such an effect, however, the intervening cause must be one not procured by the original wrongful act or omission.    Where the evidence discloses a succession of intermediate events, each dependent upon the one immediately preceding it, and all depending upon such original act, the latter is, in legal contemplation, the primary cause of the resultant injury.

3. ———: ———: QUESTION FOR JURY.    Whether the natural connection of events is maintained or interrupted by the introduction of a new and independent cause is usually a question of fact and not of law.

4. Railroad Companies: INJURY TO PASSENGER: BURDEN OF PROOF.    It is sufficient under the provisions of section 3, article 1, chapter 72, Compiled Statutes, in an action to recover for injuries received by the plaintiff while a passenger on a railroad train in this state, to prove that such injuries resulted from the operation and management of the road.    The law infers negligence from the fact of the injury and imposes upon the railroad company the burden of proving that the case is within one of the exceptions mentioned in the statute.

5. Carriers: NEGLIGENCE: PERSONAL INJURIES.    A common carrier of passengers is liable for personal injuries to passengers produced by the concurrent negligence of its servants and third persons.

6. ———: ———: ———.    Independent of the statutory rule, a passenger who is placed in a position of apparent imminent peril through the negligence of a carrier may recover for injuries received while endeavoring to escape in obedience to the natural instinct of self-preservation, provided he exercise ordinary prudence in view of the circumstances, as they appear to him at the time.

7. ———: ———: ———.    And such is the rule, although it subsequently appear that the danger was apparent only, and not real, since the carrier, whose negligence is the proximate cause of the injury, cannot complain on the ground that passengers err in their estimate of the danger confronting them or the choice of means to insure their safety.

8. ———: ———: EVIDENCE.    Under an allegation that "the braking apparatus of said car * * * was in bad repair, the brake chain broken, and said brake useless for the purpose of stopping

33

said car or controlling its movements," *held* not to disclose such
a relation of the chain mentioned to the braking apparatus as to
warrant the inference that the escape of the car resulted from
that cause alone, and that it was not error to receive evidence
tending to prove that the brake rod was broken and useless.

9. Witnesses: LEADING QUESTIONS: REVIEW. While a party
will not ordinarily be permitted to lead his own witness, that
rule has especial application to the trial court, which may for
sufficient cause permit leading questions, and its action in that
regard presents no ground for reversal in the absence of a clear
abuse of discretion.

10. Damages: MENTAL SUFFERING. Mental and bodily suffering
is incapable of measurement by any fixed and arbitrary rule,
but must from its nature depend largely upon the judgment of
the jury, governed by the circumstances of each particular case.

11. Carriers: NEGLIGENCE: PERSONAL INJURIES: DAMAGES.
The plaintiff below jumped from a moving train in order to es-
cape a threatened collision with a runaway freight car due to
the negligence of the defendant. In jumping she severely in-
jured her left ankle and was unable to sleep on account of pain
for seventy hours, was confined to her bed three weeks, and
unable to walk without the assistance of crutches for five
months. A surgeon who examined the injured limb the follow-
ing day testified that from the crepitus or grating sound ob-
servable on moving and pressing upon the ankle there was an
evident fracture of the astragalus or ankle bone. At the time
of the trial three years later her ankle was still enlarged and
extremely sensitive, with partial anchylosis or permanent stiff-
ness of the joint, and evidence tending to prove that such con-
dition, including present lameness, would be of long duration
and probably permanent. *Held,* That a verdict of $3,000 is not
excessive.

ERROR from the district court for Clay county. Tried
below before HASTINGS, J.

The facts are stated in the opinion.

*M. A. Reed, W. S. Prickett,* and *L. P. Crouch,* for plaint-
iff in error:

When the injury happened the persons through whose
instrumentality it was inflicted must have been engaged

St. Joseph & G. I. R. Co. v. Hedge.

in doing an act for the person sought to be charged with liability. (Wood, Law of Master & Servant, sec. 281; *Roddy v. Missouri P. R. Co.*, 104 Mo., 246; *Hitte v. Republican V. R. Co.*, 19 Neb., 620; *Meyer v. Midland P. R. Co.*, 2 Neb., 319; *Stevenson v. Chicago & A. R. Co.*, 18 Fed. Rep., 493.)

If subsequent to the original wrongful or negligent act a new cause has intervened of itself sufficient to stand as the cause of the misfortune, the former act or cause must be considered too remote. (*Mire v. East Louisiana R. Co.*, 7 So. Rep. [La.], 473 ; *Stanton v. Louisville & N. R. Co.*, 8 So. Rep. [Ala.], 798; *Pease v. Chicago & N. W. R. Co.*, 20 N. W. Rep. [Wis.], 908; *McClary v. Sioux City & P. R. Co.*, 3 Neb., 44; Wharton, Law of Negligence, secs. 134, 438 ; *Schmidt v. Mitchell*, 84 Ill., 195; *Tweed v. Mutual Ins. Co.*, 7 Wall. [U. S.], 44; *Chicago, B. & N. R. Co.*, 46 N. W. Rep. [Minn.], 76.)

The defendant in error was without legal justification in exposing herself to the hazard of jumping from the moving train. (*Coulter v. American M. U. Express Co.*, 56 N. Y., 585; *Gulf, C. & S. F. R. Co. v. Wallen*, 65 Tex., 568; *Chicago, R. I. & P. R. Co. v. Felton*, 33 Am. & Eng. R. Cas. [Ill.], 533 ; *Kleiber v. People's R. Co.*, 107 Mo., 240 ; *Gumz v. Chicago, M. & St. P. R. Co.*, 10 N. W. Rep. [Wis.], 13.

It is error to introduce evidence of carelessness and negligence not pleaded, as it introduces an issue not raised by the pleadings. Having specifically alleged certain acts of negligence, proof of others was error. (*Ravenscraft v. Missouri P. R. Co.*, 27 Mo. App., 617; *Waldhier v. Hannibal & St. J. R. Co.*, 71 Mo., 514; *Schneider v. Missouri P. R. Co.*, 75 Mo., 296 ; *Alabama G. S. R. Co. v. Richie*, 12 So. Rep. [Ala.], 612.)

The damages assessed by the jury are excessive. (*Klein v. Jewett*, 26 N. J. Eq., 474; *Tuttle v. Chicago, R. I. & P. C. Co.*, 42 Ia., 518; *Northern C. R. Co. v. Mills*, 16 Md., 355;

*Wyandotte v. Agan,* 37 Albany L. J., 38 ; *Fuller v. Naugatuck R. Co.,* 21 Conn., 557 ; *Baltimore C. P. R. Co. v. Kemp,* 61 Md., 74 ; *City of Atlanta v. Martin,* 13 S. E. Rep. [Ga.], 805 ; *Smith v. City of Des Moines,* 51 N. W. Rep. [Ia.], 77 ; *Girard v. St. Louis Car Wheel Co.,* 46 Mo. App., 79 ; *Wesley v. Chicago, St. P. & K. C. R. Co.,* 51 N. W. Rep. [Ia.], 163 ; *City of La Salle v. Porterfield,* 38 Ill. App., 553 ; *Buck v. People's S. R. & E. L. & P. R. Co.,* 18 S. W. Rep. [Mo.], 1090.)

*Thomas Ryan* and *Epperson & Sons, contra:*

A railroad company is liable for an injury sustained by a passenger in leaping from a train, although if he had remained in the cars he would have been uninjured, if the leaping was rendered an act of reasonable precaution on such passenger's part on account of his perilous position through the fault of the company or its servants. (*Lincoln Rapid Transit Co. v. Nichols,* 37 Neb., 332; *Southwestern R. Co. v. Paulk,* 24 Ga., 356; *Buel v. New York C. R. Co.,* 31 N. Y., 314; *Caswell v. Boston & W. R. Corp.,* 98 Mass., 194; *Twomley v. Central Park, N. & E. R. R. Co.,* 69 N. Y., 158; *Galena & C. U. R. Co. v. Yarwood,* 17 Ill., 509; *Schultz v. Chicago & N. W. R. Co.,* 44 Wis., 638; *Missouri P. R. Co. v. Baier,* 37 Neb., 235; *Galena & C. U. R. Co. v. Fay,* 16 Ill., 558.)

The verdict is not excessive. (*Illinois C.R. Co. v. Barron,* 5 Wall. [U. S.], 90; *Heucke v. Milwaukee City R. Co.,* 34 N. W. Rep. [Wis.], 243; *Atchison, T. & S. F. R. Co. v. Moore,* 31 Kan., 197; *Quinn v. Long Island R. Co.* 34 Hun [N. Y.], 331; *Rockwell v. Third Avenue R. Co.,* 64 Barb. [N. Y.], 439; *Funston v. Chicago, R. I. & P. R. Co.,* 61 Ia., 452; *Hinton v. Cream City R. Co.,* 65 Wis., 323; 3 Sutherland, Damages, p. 730; *Gale v. New York C. & H. R. R. Co.,* 76 N. Y., 595.)

POST, J.

On the 2d day of January, 1890, the defendant in error Mrs. Hedge, at the city of Fairfield, purchased of the plaintiff in error, the St. Joseph & Grand Island Railroad Company (hereafter called the "railroad company") a ticket good from the station above named to the city of Hastings and took passage on a west-bound freight train which was also accustomed to carry passengers between said stations. When the train in question had reached a point about one mile east from Hastings a stop was made for the purpose of taking on a car loaded with brick then standing on a side track constructed for the accommodation of the proprietor of the brick yards there located. In order to take on the car mentioned, the train was cut so as to leave the caboose and one or two freight cars east of the switch connecting the side track with the main line. The side track is constructed on a grade which inclines toward the main line, so that cars left thereon unsecured will by force of gravity alone run down to and upon the main track. To prevent this a safety switch had been constructed in connection with the side track so arranged that when left open it served to disconnect the siding from the main track, and cars coming down the grade from the brick yards would accordingly be run onto what is known as a spur instead of the main track. But when closed, said switch served to connect the rails of the siding, thus making a continuous track from the brick yard to the main line. In order to take on the car of brick it was necessary for the men in charge of the train to move a partially loaded car standing in front thereof. This was accomplished by pulling the two cars mentioned onto the main track and, after coupling the loaded car into the train, pushing the other back onto the siding and blocking the wheels thereof with billets of wood in order to keep it in position. It seems that the point where the last named car was left was too far

above the brick-kiln to enable the yardmen to complete their task of filling it. The latter thereupon undertook to move it down the track to its proper place, when it was discovered that the brake rod thereof was broken and dragging so that it was impossible to hold the car in position by that means, and the billets of wood referred to, one four by four and the other two by four inches, proved insufficient for that purpose. In consequence thereof the car escaped from the men in charge, and the safety switch above mentioned, being still closed, it followed the siding onto the main track with the result hereafter stated. While the conductor and brakeman were engaged in an attempt to lock the switch connecting the main track with the siding, the former discovered that the brick yard men were unable to control the car, and that a collision was imminent on account of their inability to close the switch (the lock being out of order), gave the signal to pull up. His signal seems to have been recognized and obeyed by the engineer, since the train was started and so nearly cleared the switch that the wild brick car merely struck the iron bar or hand rail at the end of the caboose. There were at that instant three men in the overhead lookout of the caboose, and who were evidently watching the brick car approaching the switch, as indicated by the following quotation from the testimony of Mrs. Hedge, who is strongly corroborated by other witnesses :

Q. What first attracted your attention to this car of brick?

A. The first was from hearing remarks made in the caboose by different parties relative to this car.

Q. What was said?

Objection. Overruled. Exception.

A. The first is " That is a dangerous switch."

Q. What else, if you remember?

A. That the car was going to get away from the old man; that he could not handle it.   *   *   *

Q. What else do you remember being said there about this matter?

A. That there was danger, and we had better be getting out of there.   *   *   *   I heard that first from the look-out.

Q. Did they [the men in the lookout] get down when they made the remark about getting out?

A. Yes, sir.

Q. Where did they go, if any place?

A. They went out.

Q. In what manner?

A. Hurriedly.

Q. What remarks did you hear from others as they went out?

Objected to, as incompetent, irrelevant, and immaterial. Overruled.   Exception.

A. I heard the remark outside, "Jump for your lives." *   *   *

Q. Whom was that remark addressed to, if you, as you understood it?

A. To ourselves.

Q. What were the parties in the lookout doing when that remark was made?

A. They were getting out through the narrow passage-way.   *   *   *

Q. What did they do when they reached the platform?

A. I suppose they jumped, but did not see them.

Q. Was the car in motion at that time?

A. Yes, sir.

Q. Where did you find those parties when you reached the platform?

A. On the ground.

Q. In what positions?

A. They were lying down.   I cannot say just what position.

Q. They were not upright?

A. No, sir; they were not standing up.

Q. Who was with you at the time?

A. Mrs. Dinsmore.

Q. What did she do?

A. She jumped out from the train just ahead of me.
\* \* \*

Q. What happened to you when you jumped?

A. I do not know.

Q. What is the first thing you can recollect?

A. The first thing I can remember is they were gathering around me and I was trying to get up.

The following is a quotation from the testimony of Mrs. Dinsmore:

Q. What was the condition of the caboose in that respect at the time of the speaking of the remark? [Referring to the character of the switch.]

A. It was standing still.

Q. What occurred afterward?

A. The engine started up so quickly that I nearly fell on the stove. I took my seat, and just as I took my seat some one in the look-out said (Objection. Overruled. Exception.): "That car will get away from that old man. We had better be getting out of here. Every one run and jump quick." \* \* \* There were some in the lookout, I know, that ran and jumped.

Q. Were they men or women?

A. They were men. \* \* \*

Q. What occurred when you reached the platform on the end of the car?

A. I turned before I got out on the platform to see if Mrs. Hedge was coming, and when I got to the platform I jumped. I did not see Mrs. Hedge again until I found her on the ground.

Q. What, if anything, did you hear in the way of directions as to what to do?

A. I was told to hurry up quick.

Q. At the time this was said what were the other passengers doing?

A. They were getting out as fast as they could.

And Mr. Morris, who was at the time employed at the brick yards, testified that the direction "jump for your lives" was given by a brakeman at the rear end of the caboose.

The injury, which is the foundation of this action, was, as will be perceived from the evidence above quoted, received by Mrs. Hedge in jumping from the caboose, and the questions presented all relate to the liability of the railroad company therefor.

We will first notice the assignment relating to the agreement between the railroad company and Hurley, the proprietor of the brick yards, under which the side track and switches were constructed. The offer was to prove that said tracks were graded by Mr. Hurley, the company merely furnishing the rails and ties; that they were constructed for the exclusive use and accommodation of the former, that cars were delivered to him on said track whenever demanded and were, while they remained thereon, under his exclusive control. The evidence so offered was excluded on the objection of the plaintiff below, and the ruling thereon is one of the grounds assigned in the motion for a new trial as well as in the petition in error. The contention of the railroad company with respect to that question is best illustrated by a quotation from its brief, viz.: "If Hurley's men had not meddled with the car at the inopportune time, the accident would not have happened. * * * The car would have stood there securely blocked with wood under its wheels till doomsday and injured no one. * * * The defective brake cannot in law be considered the proximate cause of the accident. The rule is that if subsequent to the original wrongful or negligent act a new cause ' has intervened sufficient of itself to stand as the cause of the misfortune the former act or cause must be considered too remote.' "

The rule thus invoked is an ancient and salutary one, but cannot be said to be applicable to the admitted facts of the case before us. The question in all such cases is whether the facts shown constitute a continuous succession of events so linked together as to make a natural whole, or was there a new and independent cause intervening between the wrong and the injury. The intervening cause must be one not produced by the alleged wrongful act or omission, but independent of it, and adequate to produce the result in question. There may be, it is evident, a succession of intermediate causes, each dependent upon the one preceding it and all so connected with the primary cause as to be in legal contemplation the proximate result thereof. The foregoing proposition is exemplified by the following authorities: Ray, Negligence of Imposed Duties, 699; *Milwaukee & St. P. R. Co. v. Kellogg*, 94 U. S., 469; *Purcell v. St. Paul City R. Co.*, 48 Minn., 134; *Mahogany v. Ward*, 16 R. I., 479. Whether the natural connection of events is maintained or broken by the intervention of a new and independent cause is, according to the authorities cited, a question of fact. Therefore, assuming the act of the yard men to have been the immediate cause of the injury, the question whether such act naturally resulted from the negligent leaving of the car at a point above the brick-kiln and the neglect of the trainmen to open the safety switch was properly submitted to the jury. The suggestion that cars, while on the side track, are under the exclusive control of Hurley, the proprietor of the brick yard, and that the railroad company is accordingly not liable for the alleged negligent acts, is not entitled to serious consideration. The relation of carrier and passenger existed at the time of the injury, and the duty imposed upon the former was to safely carry the latter, subject to the conditions named in the statute. (Sec. 3, art. 1, ch. 72, Comp. Stats.) In *Missouri P. R. Co. v. Baier*, 37 Neb., 235, and in *Union P. R. Co. v. Porter*, 38 Neb.,

226, it was held sufficient for one who has received personal injuries while a passenger on any line of railroad in this state to prove that such injury resulted from the operation or management of the said road, and that the law will presume negligence from that fact alone. The direct and immediate cause of the injury charged was the exposing of the passengers on the caboose to the peril of collision with the wild freight car by means of the open switch. If the railroad company negligently exposed the plaintiff below to danger in the manner indicated, and which resulted in the injury alleged, the fact that the escape of the freight car was in nowise attributable to its negligence must, in view of the statute above cited, be regarded as immaterial. The same result is reached also by another and more direct course of reasoning, viz., the offer was in effect to prove that the injury complained of resulted from the concurrent negligence of the defendant railroad company and Hurley, a stranger, and is therefore directly within the principle recognized in *Pray v. Omaha Street R. Co.*, 44 Neb., 167.

We will next examine the assignment relating to the sufficiency of the evidence. The only additional testimony which calls for notice in this connection is that of Mr. Swearingen, the conductor, who was at the time of the injury evidently near the rear end of the caboose, and substantially corroborates the other witnesses respecting the hurried exit of the passengers. He also heard one of them, Mr. Furrer, addressing the others, say to get off the car. Said witness testified, however, that the caboose had cleared the switch at the time Mrs. Hedge jumped therefrom, and that there then existed no danger of a collision with the freight car. From the facts thus stated it is argued that in jumping from the moving train the plaintiff below was guilty of contributory negligence within contemplation of the statute, and which amounts to a defense in this action. But to that proposition we cannot give our

assent. In *Omaha & R. V. R. Co. v. Chollette*, 33 Neb., 143, and *Chicago, B. & Q. R. Co. v. Landauer*, 36 Neb., 642, it was held not such negligence to jump from a moving train as will in every instance defeat a recovery under our statute. But independent of the statutory rule, a passenger placed in a position of apparent imminent peril through the negligence of the carrier may recover for injuries received while endeavoring to escape in obedience to the natural instinct of self-preservation, provided he exercises ordinary prudence in view of all of the circumstances of the case; and such is the rule, although it subsequently appears that no actual danger existed. (*Lincoln Rapid Transit Co. v. Nichols*, 37 Neb., 332, and cases cited.) The scene at and immediately preceding the injury was apparently one of confusion and terror. The hurried exit of the men who were watching the runaway car from the lookout, and the cry "Jump for your lives!" accompanied by the sudden starting of the train, when regarded from the standpoint of the plaintiff below, certainly tend to establish reasonable ground for the apprehension of imminent peril; and the railroad company is in no position to complain on the ground that she erred in her estimate of the danger confronting her, or the choice of means to insure her safety.

Exception was taken to the admission of evidence by the plaintiff below as to the condition of the broken rod of the runaway freight car and which tends strongly to prove that said rod was broken and useless for the purpose of controlling the car. The ground of the objection is that said evidence is immaterial under the issues. The allegation of the petition is: "The braking apparatus of said car at the time and before it was placed on said side track was in bad repair, the brake chain thereon broken, and said brake was useless for the purpose of stopping said car or controlling its movements." True, the broken rod is not specifically mentioned in the pleadings, but the allegation that the braking apparatus was in bad repair and useless for

the purpose of controlling the car is a sufficient foundation for the proof. Had the petition disclosed such a relation of the chain mentioned to the braking apparatus as to warrant the inference that the escape of the car resulted from that cause alone, a different question might have been presented; but the allegation quoted is not such as, by any natural construction, to exclude defects other than that above named.

Exception is also taken to the admission of testimony tending to prove that it was the duty of the trainmen to open the safety switch after pushing the freight car onto the side track, but a reference to the record shows that the only objection urged to the questions mentioned is that they are leading and suggestive. A party will not, as a general thing, be permitted to lead his own witnesses, but the rule in that regard is especially applicable to the trial court, and the subject is so far a matter within the discretion of the court as to present no ground for reversal in the absence of a clear abuse of discretion. (*St. Paul Fire & Marine Ins. Co. v. Gotthelf*, 35 Neb., 351.)

Lastly, it is argued that the damage, $3,000, is excessive, and that the verdict should have been set aside on that ground. Mrs. Hedge, according to the undisputed evidence, was, as the result of the injury, confined to her bed for three weeks, and was unable to walk without the assistance of crutches for nearly, if not quite, five months. For seventy hours after the injury she was unable to sleep on account of pain, and was, at the time of the trial, in March, 1893, unable to use or bend her left ankle without considerable pain. Dr. Prentiss, an experienced surgeon, who made a careful examination of her limb on the day of the accident or the day following, testifies to a severe sprain of the ligaments, and that from the crepitus or grating sound observed when moving and pressing upon the ankle there was an evident fracture of the astragalus or ankle bone, and that in his opinion her present lameness will be

of long duration, if not permanent. Dr. Steel, who examined the limb in September, 1892, found the ankle swollen and enlarged, with partial anchylosis or permanent stiffness of the joint. It was also extremely painful and sensitive to the touch. On the second examination a few days before the trial the witness observed the same condition of the ankle, except that the swelling and tenderness were less pronounced. He states as his conclusion that the limb, in all probability, will never be restored to its normal condition. On the other hand, Dr. Neville and Dr. Gilbraith, who examined the injured limb in January or February, 1891, about twelve months after the accident, testify to a severe sprain, but discovered no evidence of a fracture of the astragalus. It has been frequently said by this court that mental or bodily anguish is incapable of measurement by any fixed and arbitrary rule, but from its nature must depend largely upon the judgment of the jury, based upon the circumstances of the particular case. Judged by that rule the verdict cannot be said to be so decidedly against the weight of the evidence as to call for interference in this proceeding. The judgment must accordingly be

AFFIRMED.

RYAN and RAGAN, CC., not sitting.