VERA GRIFFEN, APPELLEE, v. LINCOLN TRACTION COMPANY, APPELLANT.

FILED MAY 8, 1929. No. 26470.

*Hainer, Flansburg & Lee,* for appellant.

*Littrell & Patz* and *Reavis & Beghtol, contra.*

Heard before GOSS, C. J., GOOD, THOMPSON, EBERLY and DAY, JJ., and REDICK and SHEPHERD, District Judges.

EBERLY, J.

In this case the Lincoln Traction Company, hereinafter referred to as the defendant, appeals from the judgment of the district court for Lancaster county, in favor of Vera Giffen, who will hereafter be called the plaintiff. The action was brought by the plaintiff for injuries alleged to have been received on the 30th day of April, 1927, while a passenger in the city of Lincoln in one of defendant's buses, and which are charged to lbe due to the negligence of defendant's servants in the operation of the bus upon which she was a passenger. The defendant denies the existence of the injuries and the negligence alleged, but did not plead contributory negligence. The jury determined the issues adversely to the defendant's contentions. The defendant challenges this determination as unsupported by the evidence.

On the day of the accident the plaintiff boarded a bus belonging to and operated by the defendant in the downtown district of the city of Lincoln. She was going to her home near Thirtieth street of that city. The route of this bus was over R street and across Twenty-fourth street and Thirtieth street intersections. The scene of the accident was on R street, west of the Twenty-fourth street intersection. As the bus in question was, on this occasion, proceeding east on R street, which runs east and west, and as it approached Twenty-fourth street, which runs north and south, defendant's evidence is that it was traveling a little south of the center of R street and was proceeding eastward at a rate of from 14 to 18 miles an hour. The only evidence in the record is that the paved portion of Twenty-fourth street is approximately 30 feet in width and that the paved portion of R street is approximately 40 feet in width.

The evidence of plaintiff's witnesses is at this time while this bus was only 10 to 12 feet from the south curb there was a turn to the right (south) followed instantaneously by a sharp swerve to the left (north) ; "it seemed for an instant like the bus would tip over" and the bus then stopped. Plaintiff testifies that during this trip the bus had been filled to its capacity and, in addition, a number of passengers, including plaintiff, had been compelled to stand; that plaintiff was then standing in the rear of this conveyance where, owing to the plan of its construction and the presence of so many passengers, there were no handholds or other means of support available to her; that due to this sudden, sharp and unexpected movement she was thrown against a seat and received injuries of which she complains.

Defendant's driver says in part that as he approached Twenty-fourth street he saw a "roadster or coupé" going north, "following the west side of Twenty-fourth street, and going at, I should judge, about 35 miles an hour, and as he got just about to the intersection, instead of going straight ahead, as I thought he would, I slowed up, thinking he would go straight ahead. * * * He turned a circle,

and started coming toward the front of the bus. I pulled as near the curb as I could; thought he would see me and turn to the right. * * * Q. Did you notice any other occupants in the car? A. I noticed one of them. Q. Did you notice what direction they were looking? A. They were looking directly away from where they were going, to the northeast; they were looking to the right and turning to the left. Q. And they came directly toward your bus? A. Yes, sir; making a turn, appearing to be making a circle; that is, they were making a circle and turning. Q. How close to the corner, the southwest corner of the intersection, did they come? A. Well, somewhere around from 10 to 15 feet, I could not say exactly, kind of swung out toward the center of it, making another turn. Q. They cut across the corner? A. Cut across the corner. Q. Between the center of the intersection and the curb to the southwest? A. Yes. Q. Then you turned to the north (south?) didn't you? A. I turned to the north (south?) first thinking they would see me and go to my left or their right, where they should have gone. Q. And then you turned which direction? A. Then I turned to the left, and across in front of them, and saw they were not looking and knew they could not stop in that time. Q. How far was the bus from Twenty-fourth street when this coupé came to the corner headed at you? A. I would not say exactly, somewhere around 30 to 40 feet when it came around the corner. Q. And where was your bus when you came to a stop? A. Well, it was about 6 feet away from the northwest curb, the front end of the bus somewhat in the intersection. Q. To the north of R street? A. Yes; on the north side of R. Q. And to the west of Twenty-fourth street? A. It was on the west side of Twenty-fourth street. Q. How close did this car come to hitting the bus as it went by? A. The Ford car, you mean? Q. Yes. A. Barely missed it about a foot, I should judge. Q. Your actions there turning toward the curb and turning away was all one action, almost instantaneously? A. Yes."

H. K. Watson, a witness for the defendant, who designated the automobile that came north on Twenty-fourth

street and caused the trouble as a "Star car," testified on cross-examination as follows: "Q. I thought you said that after this Star car had turned the intersection of Twenty-fourth and R it was headed straight at this bus, while the bus was going east and the Star car was going west? A. Yes, sir. Q. Well then did the Star car turn any after that? A. Yes, sir. Q. Which direction did it turn? A. Turned west. Q. Well, it was already going west? A. It was going northwest. Q. Well, then, all right then, it was not going west directly at this bus when it turned the intersection, if that is right. Now let us start over again. Did you see this Star car as it left Twenty-fourth street and entered R street? A. Yes, sir. Q. What direction was it going then? A. Going northwest. Q. And how far did it continue to go northwest? A. Not quite to the middle of R street. Q. Then what direction did it go? A. Turned west. Q. Turned west and then went straight west, didn't it? A. Yes, sir. Q. And then after that did it make any turn? A. No, sir. Q. Well, how did it get past the bus? A. The bus turned at the same time; the bus turned northeast at the same time the car turned west. Q. That is when the bus driver started to get his bus out of the middle of the street the Star car was headed northwest making this turn? A. Yes, sir. Q. Then the bus driver got his car out in the middle of the street and this fellow with the Star car turned around to get back past the bus on the south, didn't he? A. Yes, sir."

It is admitted that the driver of the bus gave no alarm by horn or otherwise.

Without assuming to determine the ultimate facts in this controversy, but only for the purpose of determining whether the evidence in the record supports the inferences necessary to sustain the verdict of the jury, it may be said to be fairly established that the car going north on Twenty-fourth street "cut the corner" turning into R street, but was at least "10 or 15 feet" from the "southwest corner of this intersection" at the time of leaving the same, and then still proceeding in a northwesterly direction; and that it

continued in a northwest course, until not quite in the middle of R street. The moment the bus changed its course from "east to northeast," the Twenty-fourth street automobile changed its course from "northwest to west." This evidence, if believed, amply sustains the conclusion that there was a zone of perfect safety of from "10 to 15 feet" in width extending from the west boundary of the Twenty-fourth street intersection along the entire south side of R .street which was at no time passed over by the interfering automobile and the security of which was at no time even threatened. The maneuver of the driver of the bus in turning the same to the left and away from the "zone of safety" was as a matter of fact not only unjustified, but inevitably exposed his passengers to increased dangers both of collision and of injuries due to the sudden and violent swerving of the bus.

The principles defining the liability of common carriers of passengers in this jurisdiction as applicable to the situation above disclosed have been clearly announced. Bus companies operating after the manner of the defendant herein are common carriers of passengers and are liable as other common carriers upon common-law principles. They are required to exercise the utmost skill, diligence and foresight consistent with the business in which they are engaged for the safety of the passengers, and they are liable for the slightest negligence. *Lincoln Traction Co. v. Webb,* 73 Neb. 136.

Even if it be conceded that the acts of the driver of the interfering automobile in the instant case, that turned west into R street from Twenty-fourth street, constituted negligence that contributed to cause the injury complained of, still it was incumbent upon the defendant driver, in view of the circumstances in the case, and the presence of the emergency created thereby, to continue to exercise the utmost skill, diligence and foresight. While due regard must be given to the sudden peril which confronted him, yet if lack of such due care of defendant's driver, under these circumstances, contributed to plaintiff's injuries, the rule ap-

plicable would be that common carriers of passengers are liable for personal injuries to passengers produced by concurrent negligence of its servants and third persons. *St. Joseph & G. I. R. Co. v. Hedge*, 44 Neb. 448; *Pray v. Omaha Street R. Co.*, 44 Neb. 167. But it is thought that the situation in the instant case is not one to which the rule quoted is applicable. Here there was an adequate zone of safety along the south side of R street. By statute: "Whenever any persons, traveling with any carriages, shall meet on any road in this state, the persons so meeting shall seasonably turn their carriages to the right of the center of the road, so as to permit each to pass without interfering or interrupting." Comp. St. 1922, sec. 2770.

"The term 'carriage' as used in this article, shall be construed to include stage coaches, wagons, carts, sleighs, sleds and every other carriage or vehicle used for the transportation of passengers and goods or either of them." Comp. St. 1922, sec. 2777.

It was therefore the duty of defendant to comply with the terms of the statute, and in view of its admitted failure to do so and the circumstances connected therewith, the implication of negligence cannot be escaped. Indeed, even in a case wherein it is applicable, we recognize the difficulty in the rule which defendant seeks to invoke, which would authorize or would require a traveler proceeding within the law of the road to technically violate it, by turning to the left in order to avoid the consequences of the wrongful act of an approaching traveler who is on the wrong side of the road. This is true, because, although a traveler "on the right" may know that if the oncoming vehicle maintains its course there will inevitably be a collision, still he cannot know that the driver of such car will not turn out in time to avoid a collision.

Even in the extreme case the better course would seem to be for him either to hold his course, on the right side of his highway, or to stop, relying on the other driver changing his course in time, and it is so held in some jurisdictions. *Cupples Mercantile Co. v. Bow*, 32 Idaho, 774.

In any event, even if this rule on which defendant relies is to be ultimately accepted in this jurisdiction, a matter which we do not determine, it is wholly inapplicable to the controlling facts of this record. In the present case, in view of the facts disclosed by the evidence, the jury were fully justified in determining that there was no excuse for the technical violation of the terms of our statute by the driver of the bus. This conclusion is proper, even though his action be not judged by the rule and measurement of a calm calculation, but determined by its reasonableness in the light of the circumstances as then existing, as they must have appeared to him in the situation he found himself at the time of the occurrence of the accident. For plainly there was then, as we have already seen, "a reasonably safe place for the driver of defendant's bus to turn out to the right."

We also find that the evidence in the record is ample to sustain the verdict both as to the question of the nature and extent of injuries suffered. We have given due consideration to alleged errors in the instructions to the jury, complained of by the defendant, and do not find that, in view of the instructions actually given, the defendant's rights were in any manner prejudiced by the failure to give the instructions requested by it, nor by the giving of any of the instructions excepted which were given by the court on its own motion.

It follows that the judgment of the trial court is right and it is

AFFIRMED.

Note—See Carriers, 10 C. J. 607 n. 74, 867 n. 40, 1058 n. 37; 4 A. L. R. 1499; 31 A. L. R. 1202; 45 A. L. R. 297.